Josephine **MILLER**, Harrison Garnet Miller, and John Albert Miller, each individually and as co-partners doing business under the partnership name and style of Miller Farms, Plaintiffs and Respondents,

v.

Otto **KLINDWORTH**, individually, and doing business as Klindworth Seed and Supply Company, and John Landowski, Defendants and Appellants.

No. 7762.

Supreme Court of North Dakota.

July 10, 1959.

Rehearing Denied Aug. 31, 1959.

T. A. Roney, Carrington, Duffy & Haugland, Devils Lake, Dorsey, Owen, Scott, Barber & Marquart, Minneapolis, Minn., of counsel, for appellants.

Nilles, Oehlert & Nilles, Fargo, for respondents.

BURKE, Judge.

This is an action for damages alleged to have resulted from a sale of mislabeled seed wheat. In their complaint the plaintiffs alleged that they entered into a written contract with the defendants for the purchase of 200 bushels of Selkirk seed wheat; that pursuant to such contract the defendants delivered to them 200 bushels of wheat in sacks which were labeled "Selkirk"; that Selkirk wheat is a rust resistant variety of wheat; that plaintiffs planted the seed according to the best agricultural practices; that the growing crop became highly infested with rust, and as a result gave a low yield of poor quality wheat; that the seed furnished by defendants was not Selkirk wheat as had been agreed upon and warranted; that had it been Selkirk it would have produced a crop of the value of $18,000 whereas the seed actually furnished produced a crop of the value of $2,997.61 and that by reason of the breach of contract and breach of warranty by defendants, plaintiffs were damaged in the sum of $15,002.39. The defendant, Klindworth, in his answer alleged that he sold seed wheat to the defendants which he had purchased from Inland Grain Processing Company of Prosser, Washington, as Selkirk wheat; that such wheat was contained in sacks bearing labels describing the wheat as Selkirk wheat; that prior to sale, the

wheat had been identified by the State Seed Department as Selkirk wheat; that defendant, Klindworth, made no representations or warranties with respect to such wheat and that the same was purchased by the plaintiffs upon the basis of an inspection of a sample and the label of the Inland Grain Processing Company; that defendant, Klindworth, believed that such wheat was Selkirk wheat and that in the contract for the sale of such wheat the parties agreed that "Klindworth Seed and Supply Co., gives no warranty, express or implied, as to description, quality, productiveness or any other matter of any seed it sells and will not be responsible for the crop." In their reply the plaintiffs alleged that the disclaimer of warranty, contained in the contract, was unlawful and void.

The issues in the case were tried to the court without a jury. Judgment was rendered in favor of the plaintiffs and against the defendants in the sum of $6,352.15. The defendant, Klindworth, has appealed from the judgment and has demanded a trial anew in this court.

There are two main issues upon this appeal. The first concerns the effectiveness of the disclaimer of warranty which was made a part of the contract of sale. The second is whether the evidence is sufficient to support the judgment.

It is plaintiffs' contention that the disclaimer is ineffective for any purpose because it is unlawful and void. Section 9–0801, NDRC 1943, provides:

"Any provision of a contract is unlawful if it is:

"1. Contrary to an express provision of law * * *."

Section 4–0914, 1953 Supp. NDRC, provides:

"* * * It shall be unlawful for any person in this state to: * * *

"5. Use on seed labels or tags, or to use or attach to literature, or to state in any manner or form of wording designed as a 'disclaimer' or 'non-warranty' clause with the intent to disclaim responsibility of the vendor of the seed for the data on the label required by law;"

Section 4–0910, 1953 Supp. NDRC, provides:

"Each container of agricultural seed which is sold, offered for sale, exposed for sale, transported for sale, or held in storage with the intent to sell for sowing purposes within this state shall bear thereon or have attached thereto in a conspicuous place, or there shall be properly (promptly) delivered with bulk sales or movements of said seed, a plainly written or printed label or tag in the English language giving the following information:

"1. The commonly accepted name of the kind, or the kind and variety, of each agricultural seed component in excess of five percent of the whole and the percentage by weight of each. * * *"

Relying on the foregoing statutes the plaintiffs say that all agricultural seed must be labeled; that the label must bear the name of the kind and variety of the seed; that it is unlawful for a vendor of seed to disclaim responsibility for the data required by law to be placed upon the label and that such a disclaimer, being contrary to an express provision of law, is illegal and void.

Appellant, in opposition, urges that Chapter 4–09, 1953 Supp. NDRC, of which Section 4–0914, supra, is a part, is a penal statute which makes the violation of any part thereof a misdemeanor and that it therefore does not in any manner restrict a limitation of civil contract liability. He also states, that, if the statute does prohibit a disclaimer of civil liability, such prohibition only relates to the vendor who prepares the seed label and does not prohibit an intermediate vendor from disclaiming responsibility for a label prepared and affixed to the containers of seed by a grower or seed processor. In support of the latter

contention he calls our attention to Section 4–0915, Supp. NDRC, which provides in part:

"No person shall be subject to the penalties of this Act (chapter) for having sold, exposed for sale, or transported for sale in this state any agricultural or vegetable seeds which were incorrectly labeled or incorrectly represented as to kind, variety, or origin and which could not be identified by examination thereof, unless such person has failed to obtain an invoice or grower's declaration stating the kind, or kind and variety, and origin, if required, or has failed to take such other precautions as may have been necessary to insure the seed was properly identified."

■ We think the latter contention has merit. Section 4–0915, supra, exempts persons who sell seeds under the conditions specified therein from the penalties of the act. It would hardly seem logical to say that, while such persons are not subject to the penalties of the statute, they remain subject to its prohibitions. The provisions exempting certain acts from the penalties of the statute must impliedly declare that the exempted acts are not illegal. We therefore hold that Section 4–0914, supra, does not prohibit an intermediate vendor, who, under the provisions of Section 4–0915, supra, is permitted, in good faith, to rely upon the label affixed to a container of agricultural seed, by a shipper or grower thereof, from disclaiming any responsibility for, or any express or implied warranty under, such label.

■ The test of good faith on the part of an intermediate vendor is that he shall have taken "other precautions as may have been necessary to insure the seed was properly identified." Mr. Klindworth testified that he had ordered certified Selkirk wheat seed from the Inland Grain Processing Company in October 1954; that he was informed that the order could not be filled because of the Canadian embargo on Sel-

kirk, but that commercial Selkirk could be obtained in quantities from the State of Washington. Before ordering any of this commercial Selkirk, Mr. Klindworth called on Irven Hagen, Deputy State Seed Commissioner, at his office at the Agricultural College at Fargo and discussed the advisability of such a purchase with him. Mr. Klindworth stated that Hagen told him that such a purchase would be a good deal, and upon securing this opinion he made arrangements to have Hagen inspect the seed when and if he ordered it. Klindworth thereafter ordered a carload of the commercial Selkirk and when it arrived at Carrington, called Hagen by telephone and requested an inspection. Hagen went to Carrington and inspected the seed. According to Klindworth, Hagen examined the seed with a magnifying glass and after examination declared the seed to be Selkirk Wheat. Upon inquiry Hagen stated that he had a secret method of identifying Selkirk by visual examination. Substantially the same procedure was followed with the shipment to Drayton from which plaintiffs' seed was taken.

Hagen testified that he remembered he had a conversation with Klindworth before the seed was ordered, but that he did not remember what was said. He stated that upon receiving a call from Klindworth he went to Carrington and inspected the seed; that he did not say that the seed was Selkirk but that it looked like Selkirk and that it is impossible to identify Selkirk positively by visual examination. The latter statement, that it is impossible to identify Selkirk by visual examination, was in accord with all the expert testimony given at the trial of the case. Selkirk wheat is a cross in which the predominant strain is from Redman wheat and the two are identical in apparance. The only way to distinguish between the two is by growing the wheat and testing its rust resistant qualities by innoculating the plants with various races of rust.

There are some statements in Hagen's testimony, however, which cast some doubt

upon the accuracy of his recollection. The following excerpts from his testimony are illustrative of this point:

"Q. Well, now, did you ever say to him (Klindworth) that you were absolutely positive that the grain he had out there was Selkirk? A. No. There is no positive identification because we take the position that the grain is correctly labeled until proven otherwise.

"Q. Did you ever say to him that you had a secret process for designating varieties and that the secret is known only to an expert in the trade and that you are an expert? A. I have never—I don't think that I have ever told anybody that I was an expert. I don't think I have.

"Q. Do you remember, did you make that statement? A. Not that I was an expert. No.

"Q. Now you have no secret process have you? A. This secret process—by the way, I have used that with other people too, it saves a lot of time and trouble. There is no secret. In fact there is any number of publications which tells the varieties and description, some for sale and some are even given away. It's no secret process. It's merely a matter of learning the characteristics of what you are supposed—learning the characteristics of the variety and then trying to line it up with what you have in front of you. That's no secret. That's public information. Anybody can get it if they want it. It's a matter of studying and trying to learn it."

This testimony amounts to an admission by the witness that he told Klindworth he had a secret process for identifying seed. He did not deny that he used a magnifying glass to inspect the seed wheat. In the light of the now admitted fact that Selkirk wheat cannot be identified by visual inspection, the mention of a secret process

and the use of a magnifying glass were pure humbug and would tend to deceive Klindworth. This fact, together with Hagen's admission that he made an impossible but positive identification of certain wheat as Selkirk for the Federal Government by visual inspection, suggests that his identification of the Klindworth wheat may have been more positive than "it looks like Selkirk."

However, if Hagen's testimony is accepted as fact, Klindworth still took every reasonable precaution to ascertain that the wheat was correctly labeled. Between the time he received the wheat and the planting season, the best honest opinion as to variety he could get from an expert was that the wheat looked like Selkirk. Within the short time available a more positive identification was concededly impossible.

The other requirements of the statute are not in dispute. The seed was invoiced to Klindworth as Selkirk wheat and the containers bore the Inland Grain Processing Company's labels stating that it was Selkirk wheat. We therefore hold that Klindworth qualified under the provisions of Section 4–0915, supra, as a person exempt from the penalties of Chapter 4–09 and that his use of the disclaimer or non-warranty clause in the sales contract was not illegal.

The next question is whether the disclaimer or non-warranty clause is effective against the claim upon which the plaintiffs have sued. This claim arises only indirectly out of the fact that the seed furnished was not Selkirk wheat, if that be the case. Plaintiff's only claim for damages arises out of the fact he failed to get a crop of the quality and quantity expected.

In support of their contention, that the disclaimer of warranty is ineffective against such a claim, plaintiffs cite Ward v. Valker, 44 N.D. 598, 176 N.W. 129; Smith v. Oscar H. Will & Co., 51 N.D. 357, 199 N.W. 861; Rocky Mountain Seed Company v. Knorr, 92 Colo. 320, 20 P.2d 304; Phelps v. Grand Rapids Growers, Inc., 341 Mich. 62, 67 N.W.

2d 59, and Corneli Seed Company v. Ferguson, Fla.1953, 64 So.2d 162. We have reviewed the cited cases and each of them is distinguishable from the instant case. In fact in several of the cases the distinguishing feature is set forth in the opinions in the cases in explicit language.

In Ward v. Valker, supra, it was held that a printed disclaimer upon an invoice would not void an express warranty. In this case the disclaimer was a part of the order signed by one of the plaintiffs on behalf of all. In Smith v. Oscar H. Will & Co., the plaintiff received sweet clover seed instead of the alfalfa seed he had ordered. In deciding that the disclaimer did not apply, this court said: "The question presented is not whether the seed furnished was Grimm, Turkestan, or some other kind of alfalfa seed, * * * erroneously described by defendant, in breach of any warranty, express or implied, but whether the defendant did deliver to plaintiff the seed which it showed to plaintiff, and which it promised and agreed to deliver to him pursuant to its contract." [51 N.D. 357, 199 N.W. 862] The quoted statement expressly and clearly reserves the facts of the instant case from the effect of the decision.

In Rocky Mountain Seed Company v. Knorr, another case involving a delivery of sweet clover seed where alfalfa seed was ordered, the court said: "It will be observed that defendant's (buyer's) contention is not that the delivery was short in quantity, or was lacking in productiveness, or was an inferior kind of alfalfa, or that the crop failed, but rather that on the purchase of alfalfa seed plaintiff made delivery of sweet clover seed." [92 Colo. 320, 20 P.2d 305] This language also expressly withdraws the circumstances of the instant case from the effect of the decision. In Phelps v. Grand Rapids Growers, Inc., the plaintiff purchased Yellow Globe onion seed and received white onion seed and in Corneli Seed Company v. Ferguson, the grower purchased Black Diamond watermelon seed and received another variety. There is a similarity between these two cases and the in-

stant case in that the variance between the seed ordered and the seed delivered was a difference in variety rather than in kind. The claims for damages in these two cases did not arise out of lack of productiveness or crop failure as in the instant case but out of the fact that the crop produced was a different variety than the seed buyer intended to plant. This distinction is expressly referred to in the Corneli case as follows [64 So.2d 164]: "* * * although there is evidence which tends to show a failure of quality and productiveness, the actionable defect or deficiency in the seed stems from the fact that 'Black Diamond' watermelons were not produced * * *."

In Lumbrazo v. Woodruff, 256 N.Y. 92, 175 N.E. 525, 527, 75 A.L.R. 1017, the New York Court of Appeals gave effect to this distinction, in holding that a disclaimer was effective. They said: "As stated above, the principal quality of Japanese onion sets is their ability to multiply, or their productiveness. There was to be no 'guarantee' of these qualities. The plaintiff's only damage consisted in the failure to get the crop he expected or as many bushels of onions as the purchase should have produced." The same distinction was also noted in Kennedy v. Cornhusker Hybrid Co., 146 Neb. 230, 19 N.W.2d 51, 55, 160 A.L.R. 351. This case involved a delivery of inbred corn where hybrid corn had been ordered. In this case the court said: "We find also, since plaintiff's complaint goes entirely to the matter of the lack of productiveness, and his damages consisted in failure to get the yield of crop expected, or as many bushels of corn as the purchase should ordinarily have produced, it comes within the scope of defendant's disclaimers."

Some of the other cases which hold that a disclaimer is effective with respect to a description of seed are Leonard Seed Co. v. Crary Canning Co., 147 Wis. 166, 132 N.W. 902, 37 L.R.A.,N.S., 79; Hoover v. Utah Nursery Co., 79 Utah 12, 7 P.2d 270; Pyle v. Eastern Seed Co., 145 Tex. 385, 198 S.W. 2d 562. See also Annotations: 16 A.L.R. 476; 32 A.L.R. 1244; 16 A.L.R. 880. We

have considered it unnecessary to set out the wording of the disclaimers in each of the cases cited, or otherwise referred to, for the reason that they are all uniform and are practically identical to the disclaimer in this case.

Upon the basis of reason and authority we are of the view that the disclaimer here, which states that the seller of seed "gives no warranty, express or implied as to description, quality, productiveness or any other matter of seed it sells and will not be responsible for the crop", is effective against a claim for damages arising solely out of a failure of a seed purchaser to get a yield which the purchase should ordinarily have produced. It follows that disclaimer was a valid defense in this action. The judgment of the district court is therefore reversed.

SATHRE, C. J., and MORRIS, J., concur.